1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10
11  RONALD J. SMITH,

Case No.:  22-CV-856 JLS (DDL)

12                                    Petitioner,

**ORDER (1) DENYING SECOND**
13  v.                                  **AMENDED PETITION FOR A WRIT**
                                        **OF HABEAS CORPUS AND (2)**
14  MARTIN GAMBOA, Warden, et al.,      **DENYING CERTIFICATE OF**
                                        **APPEALABILITY**
15                                    Respondents.
16
17          Ronald J. Smith ("Petitioner") is a state prisoner proceeding pro se with a Second

18  Amended Petition ("SAP") for a Writ of Habeas Corpus filed under 28 U.S.C. § 2254.

19  ECF No. 16.  Petitioner challenges his 2019 conviction in San Diego County Superior

20  Court case number SCE378134 of thirteen counts of committing a lewd act on a child for

21  which Petitioner was sentenced to a total term of 30 years to life in prison.  ECF No. 1 at

22  1–2, Clerk's Tr. ("CT") 303–05, 363–67, ECF No. 24-2 at 93–95, 153–57.

23          In the sole claim in the SAP, Petitioner asserts the trial court improperly excluded

24  GPS evidence, violating his federal constitutional right to present a defense.  ECF No. 16

25  at 1; *see also* ECF No. 1 at 6.  In the Answer, Respondent maintains habeas relief is

26  unavailable because the state court's rejection of Petitioner's claim was neither contrary to

27  nor an unreasonable application of clearly established federal law, nor was it based on an

28  unreasonable factual determination.  ECF No. 23 at 2; ECF No. 23-1 at 9–10.  In the

1

Traverse, Petitioner maintains the GPS evidence was both relevant and probative and was erroneously excluded in violation of his federal constitutional rights.  ECF No. 25.

# I.     FACTUAL BACKGROUND

The following facts and background are taken from the state appellate court opinion affirming judgment in *People v. Smith*, D076849 (Cal. Ct. App. Sept. 7, 2021).  *See* ECF No. 8-6.  The state court factual findings are presumptively correct and entitled to deference in these proceedings.  *See Sumner v. Mata*, 449 U.S. 539, 545–47 (1981).

## A. *Factual background*

### 1. *The victims*

Victim S.S. is Smith's youngest child. She was born on March 10, 2011 and was eight years old at the time of trial.  Smith had three children, including S.S., with his ex-wife, N.B., and shared custody of his children with her.

Victim J.T. was born on April 14, 2003; she was 15 years old and in tenth grade at the time of trial.  Her mother, A.S., met Smith in February 2013, and A.S. and Smith were married in August 2013.

### 2. *Smith's abuse of victim J.T.*

J.T. reported that Smith touched her inappropriately many times—more times than she could count. She explained that Smith had touched her vagina, skin to skin, with his hand.  On some occasions, Smith inserted one or two fingers inside the lips of her vagina and rubbed it.  J.T. felt pain in her vagina. Smith touched her vagina both over and under her clothing.  Although J.T. testified about certain instances of abuse that she remembered, she also testified that she found it difficult to remember other specific occasions when Smith had inappropriately touched her because, she explained, "so many of them happened it's just hard to remember everything."  J.T. did not want Smith to touch her, and she did not feel safe or comfortable at home.  J.T. felt so uncomfortable that she packed a bag with a change of clothes and necessary toiletries "just in

case (she) needed to leave at any given moment" because she was "scared that something would happen to her."  J.T. thought about "(c)alling the police" or "telling somebody" about the abuse, but she "was just too afraid to do anything."

a. *Abuse that occurred at the Old Highway 80 House* [footnote: J.T.'s mother explained that in June 2013, she, J.T. and Smith moved into a home "off of Old Highway 80."  We will refer to that home as the "Old Highway 80 House"]

While J.T., her mother and Smith were living in the Old Highway 80 House, J.T. was in junior high school.  The school day ended at around 1:30 p.m.  For most of the time the family lived in the Old Highway 80 House, Smith worked for a "company called Aztec Fire and Safety."  He ended his work day earlier than A.S. did, so he would often pick up J.T. after school using his work truck.  [footnote: A.S. testified that she would not arrive home from work until "(a)t least 6 o'clock, if not later."]  Smith would sometimes pick up J.T. from school, and other times from the Boys & Girls Club.  Smith's mother would occasionally pick up J.T. after school as well.

Smith first touched J.T. inappropriately around Christmas when J.T. was 10 or 11 years old and in fifth or sixth grade, which was while they were living in the Old Highway 80 House. [footnote: J.T. had previously indicated to a child abuse detective with the San Diego Sheriff's department that Smith first touched her around "Christmastime," when she was in sixth grade and was 11 years old.]  After Smith brought J.T. home that afternoon, she was on the couch watching television.  No one else was present.  J.T. was lying on the couch when Smith sat next to her. He touched her vagina with his fingers.  He did not say anything to J.T., and she did not say anything to him.  After Smith touched her, he went out to the garage and put up Christmas decorations.

During the two to three years that J.T. lived at the Old Highway 80 House, Smith touched her at least once a week.  On those occasions, Smith would touch J.T.'s vagina or thighs.  On the occasions on which Smith would touch J.T.'s thighs, he often approached her while she was sitting on the couch watching

television.  Smith would put his hand on one of her inner thighs, near her vagina, and "m(ad)e his way up."  On the occasions when Smith would touch J.T.'s vagina, he would touch her both over and under her underwear.  Smith used his fingers and moved them.  He would touch the outside and the inside of her vagina. Specifically, J.T. testified that Smith touched inside of her vaginal lips.  J.T. sometimes felt pain, but she did not tell Smith.

Sometime after Christmas in late December 2014 or early January 2015, J.T. told her mother about Smith touching her. They were at Smith's mother's home when this initial disclosure took place.  The disclosure began when J.T. told A.S. that her vagina was hurting.  When A.S. asked her whether anyone had touched her, J.T. told A.S. that Smith had been touching her.  J.T. believed that her vagina was hurting because Smith had touched her recently. J.T. did not provide her mother with any details about the touching because J.T. did not want to talk about it.  A.S. did not ask for details about the touching because she was upset. Despite J.T.'s disclosure that Smith had been touching her, A.S. and J.T. continued to live with Smith for another eight to ten months.

Shortly before October 2015, J.T. called A.S. while A.S. was out shopping.  J.T. asked A.S. to "please come home" because she was "'really upset and uncomfortable.'"  A.S. immediately left the store.  When A.S. arrived home, J.T. said that Smith was "finding reasons to be close to her and trying to touch her," making her "very uncomfortable."  A.S. told J.T. that she would "do something" and "figure it out."  A.S. testified that [she] still did not ask J.T. for details about why she was uncomfortable because she did not want to believe "something so horrific could be happening to (her) daughter."

In October 2015, J.T. and her mother moved out of the Old Highway 80 House and into a small "granny flat" in Lakeside. J.T. did not want to move, but she did not want to continue living with Smith.  When J.T. and A.S. moved, J.T. felt relieved, but Smith continued to contact A.S. and tried to reestablish a relationship with her.  A.S. began to believe what Smith told her. She testified that she did not want to believe that Smith had abused J.T. and she loved him.  During the few months that J.T.

4

and A.S. lived apart from Smith, they did not discuss the abuse that J.T. had disclosed.

        b. *Abuse at the Lakeside Condominium* [footnote: At some point in late 2015 or early 2016, A.S. and J.T. moved with Smith into a condominium in Lakeside, which we will refer to as the Lakeside Condominium.]

A.S. and Smith reunited in December 2015. Soon after that, A.S. and J.T. moved into the Lakeside Condominium with Smith. The three of them lived there for about three months.

While the three were living at the Lakeside Condominium, Smith again began his abuse, touching J.T.'s vagina while she sat on the couch in the living room. J.T. testified that Smith touched her either once or twice—she was not sure. Smith touched her in the same manner, by touching one of her inner thighs and moving his hand up, using his fingers to touch her vagina. He touched her thigh at least once and her vagina at least once.

        c. *Abuse at the Gotta Place House* [footnote: In March 2016, J.T., A.S., and Smith moved to a home on Gotta Place, which we will refer to as the Gotta Place House.]

In March 2016, J.T., A.S., and Smith moved into the Gotta Place House. J.T. was in seventh grade at this time. She would sometimes attend drama practice at around 1:30 p.m., after she was released from classes. J.T. recalled that, during this time, either Smith or Smith's mother would pick her up from school at around 2:00 p.m. However, according to A.S., because J.T. was uncomfortable being around Smith, J.T. would often get a ride home from a friend, whether or not she had drama practice after school. Nevertheless, A.S. acknowledged at trial that even though Smith would typically not pick up J.T. [] from school while they were living at the Gotta Place House, there were "maybe . . . a couple of occasions" on which Smith picked her up. Further, Smith continued to arrive home from work before A.S. did.

J.T. testified that while they were living in the Gotta Place House, Smith continued to touch her thigh and vagina, "always" while she was on the couch in the living room.  She explained that generally, he would place his hand on one of her inner thighs, and then move his hand up, until he was eventually touching her vagina with his fingers, both over and under her clothing and underwear.  J.T. said that Smith touched her in the afternoon while they were alone in the house, or while his three children were in their bedrooms.  Smith touched J.T.'s thigh and vagina more than once at the house on Gotta Place.

### d. *J.T.'s disclosures to others*

At a birthday sleepover at the Gotta Place House, when J.T. was turning 14, she told her friend R.Y. about the abuse.  J.T. told R.Y. that Smith had touched her inappropriately and "gestured" with her hand and head toward her vagina.  R.Y. understood J.T. to be indicating that Smith had touched J.T.'s vagina.  J.T. was very upset, appeared scared, and cried when she disclosed the abuse to R.Y.

A few months later, J.T. noticed Smith outside her window looking in at her, and she felt uncomfortable.  J.T. contacted R.Y. and asked if she could spend the night at R.Y.'s house.  R.Y. and her father picked up J.T. and took her to their home.  While there, J.T. told R.Y.'s mother that Smith looked at her inappropriately and "creeped her out."  J.T. did not provide details about the inappropriate touching because she was worried about her mother and Smith's children.  J.T. cried and appeared upset throughout the conversation, but she did not seem to want to disclose much information.  J.T. showed R.Y. and R.Y.'s mother a video that she indicated showed Smith outside of her window.  R.Y.'s mother testified that she could see a shadowy figure in the video.  R.Y.'s mother offered to call the police, but J.T. indicated that she did not want such a call to be made; she was worried about disturbing her family, ruining her mother's marriage, and possibly being taken away from her mother.

In October 2017, J.T. was interviewed by a protective services worker who was investigating claims of abuse involving

Smith's daughter S.S.   J.T. had never spoken with Smith's children about the fact that Smith had been touching her inappropriately.   She was also not aware that Smith had been accused of sexually abusing S.S., and had heard only that "family court" was involved.   J.T. disclosed to the protective services worker the sexual abuse that Smith had been committing against her.   A few days later, A.S. and J.T. moved out of the Gotta Place House.

3. *Victim S.S.*

J.T.'s mother A.S. explained that when S.S. was four or five years old, she began taking showers instead of baths when at the home Smith shared with A.S.  A.S. was aware of two or three times when Smith had S.S. shower with him.   In addition, Smith would help S.S. when she showered, and he would sometimes close and lock the door to the bathroom while he was in the bathroom with S.S., explaining that he was using the bathroom and wanted privacy.

S.S. testified that Smith began touching her in her "crotch area" or "private part," starting when she was four years old.   Smith touched S.S. only when they were in the bathroom in the "master bedroom" where she took showers.   S.S. indicated that Smith helped her take showers and that both Smith and S.S. were nude while in the shower.

S.S. testified that she felt sad when Smith took showers with her.   When she saw Smith's body parts in the shower, S.S. felt sad because "it wasn't right."   S.S. told her mother N.B. that she did not want to shower with Smith; she cried about it.   N.B. called Smith and asked him to let S.S. shower with her older sister instead of with Smith; N.B. told Smith that S.S. did not like showering with him.   According to N.B., Smith yelled at her and told her that he was the parent and that it would be "gross" to have S.S. shower with her older sister.   N.B. called CWS to report Smith's showering with S.S. because she did not think it was appropriate, and S.S. was "crying real hard" and "really adamant that she did not want to shower with him anymore."

N.B. believed "there was nothing else that (she) could do to protect (S.S.) from . . . having to shower with (Smith)."

A protective services worker from CWS interviewed S.S. in September 2017; S.S. disclosed that Smith had rubbed her vagina with his hand.  S.S. explained that on one occasion, after S.S. was done showering, Smith dried her off in the bedroom.  S.S. told the investigator that Smith rubbed her "private part" with his hand, and she indicated to the investigator by pointing to her "genital area," i.e., her "vagina."  S.S.'s sister walked by when Smith was touching S.S.   Smith began "screaming at (S.S.'s sister) really bad."  S.S. indicated to the investigator that Smith touched her inappropriately on more than one occasion.

S.S. testified at trial that she felt scared and nervous while testifying at the preliminary hearing.  She saw Smith "shake his head at (her)" while she answered questions, which made her feel sad, and it felt to her "kind of like a 'don't.'"  This made S.S. feel afraid to answer questions.  When asked at trial whether she was afraid of Smith, S.S. replied, "Yes."  When asked why, she said, "I don't know."  She confirmed that she was "telling . . . the truth here today."

4. *Expert testimony regarding misconceptions about child sexual abuse victims*

The prosecution called Jayme Jones, a clinical psychologist, as an expert.  The expert testified that many child victims of sexual abuse never say anything about the abuse; victims also often delay disclosing and do not reveal that abuse occurred until years or decades later.  She testified that it is a myth that abused children "immediately tell what happened and that when they tell, they tell it in a very coherent, beginning-to-end fashion."  Children who have been or are being molested by strangers are more likely to disclose the abuse immediately than are children who are molested by people they know.  The expert explained that in some situations, a child is afraid to disclose because the abuser has threatened the child or a family member.

According to the expert, children tend to be more likely to disclose to friends than to adults. Children who have been abused multiple times may consolidate their memories of the abuse, and it is therefore more difficult for these children to remember specific or smaller details about any particular instance of abuse.

5. *The defense case*

Smith testified that his ex-wife, N.B., repeatedly tried to take their children away from him. She filed requests for emergency court hearings as part of her efforts.

When Smith began a relationship with A.S., J.T.'s mother, he was working at Aztec Fire. Smith denied that he ever touched J.T. inappropriately, and specifically denied that he did so when they were home alone after her school day ended, as J.T. testified. Smith initially denied having picked up J.T. from school, but eventually admitted that he had picked her up from school a few times a week while they were living at the Old Highway 80 House. [footnote: Smith indicated that his mother also would pick up J.T. from school during this time period.] According to Smith, at the time he began his relationship with A.S., his work day ended at around 3:30 p.m. When Smith was later promoted to the role of superintendent at Aztec Fire, he left work at around 4:30 p.m. Smith claimed that he did not leave at 1:30 or 2:00 p.m. unless there was an emergency or a doctor appointment. He explained that when he subsequently began working as a superintendent at Cosco Fire in 2015, he left work at around 4:30 or 5:00 p.m. He asserted that it took about an hour for him to get home. Smith acknowledged that A.S. would not arrive home until around 6:00 p.m., but he denied that he was home with J.T. for a couple of hours before A.S. would arrive. After J.T. made the first disclosure to her mother, Smith and A.S. agreed that Smith would no longer pick up J.T. from school.

With respect to his relationship with J.T., Smith testified that J.T. "never really wanted anything to do" with him and that she "always had a chip on her shoulder." J.T. did not care about his opinion, and seemed to want him to give her money.

22-CV-856 JLS (DDL)

According to Smith, he and J.T. would argue over her dresses and shorts, which he viewed as "too short." Smith believed that J.T. lied "all the time."

Smith stated that he showered with S.S. only once, when she was three or four years old. According to Smith, they were in a hurry to go somewhere, and that is why they showered together. Sometime after he showered with S.S., he received a phone call from a protective services worker who asked him about it. After that call, Smith would only assist S.S. in the shower, and did not shower with her again. He generally kept the bathroom door open, but admitted that he would close the master bedroom door because his son was a teenager and Smith did not want his son to see S.S. naked. Smith denied that he locked the door to the bathroom. Smith stated that he would dry off S.S., and make sure that all of her body parts were dry, including her "butt" and "vagina." He denied ever having rubbed S.S.'s vagina with his hand.

Smith called other witnesses in his defense. K.P. testified that she had known Smith for approximately 18 years at the time of trial. They had gone to high school together. She indicated that she had never witnessed Smith behave inappropriately with her children or with any other children. M.B. testified that he had known Smith for approximately two years at the time of trial and had never seen Smith behave in a sexually inappropriate manner with Smith's children, stepdaughter, or other children. Smith's mother also testified that she had never seen Smith behave inappropriately with his children or with J.T.

ECF No. 8-6 at 3–12.

## II.   RELEVANT PROCEDURAL HISTORY

In an Amended Information filed April 3, 2019, Petitioner was charged with 13 counts of lewd act upon a child in violation of Cal. Penal Code § 288(a), twelve of which related to victim J.T. (counts 1–12) and one of which related to victim S.S. (count 13). CT 23–30. The Amended Information also alleged as to all 13 counts that Petitioner had been convicted in the present case of committing offenses against more than one victim within the meaning of Cal. Penal Code § 667.61(b)(c)(e) and alleged as to counts 3–6, 8, and 11–

13 that Petitioner had substantial sexual conduct with the victim within the meaning of Cal. Penal Code § 1203.066(a)(8). *Id.* On April 23, 2019, after a jury trial, the jury found Petitioner guilty on all counts and found each of the enhancement allegations true. CT 198–210. On October 4, 2019, Petitioner was sentenced to a total term of 30 years to life, consisting of a term of 15 years to life on count 1, 11 concurrent terms of 15 years to life on counts 2–12 and a consecutive term of 15 years to life on count 13. CT 303–05, 363–67.

Petitioner appealed to the California Court of Appeal, raising six claims including the claim presented in the SAP. ECF No. 8-1. On September 7, 2021, the state appellate court vacated a portion of the fees imposed on Petitioner, affirmed the judgment as modified and remanded to amend the abstract of judgment to reflect the correct fee. ECF No. 8-6. Petitioner thereafter filed a petition for review in the California Supreme Court raising two claims, including the claim presented in the SAP, as well as a claim contending the trial court's imposition of fees or fines without determining Petitioner had the ability to pay violated Petitioner's rights. *See* ECF No. 8-7. On November 10, 2021, the California Supreme Court denied the petition, stating in full: "The petition for review is denied." ECF No. 8-8.

On June 9, 2022, Petitioner filed a federal habeas petition in this Court, raising four claims for relief, including raising a claim alleging the erroneous exclusion of GPS evidence as Claim 1. ECF No. 1. On August 30, 2022, Respondent filed a motion to dismiss the petition because it raised three unexhausted claims, and lodged portions of the state court record. ECF Nos. 7-8. On October 20, 2022, Petitioner filed a response in opposition to the motion to dismiss (ECF No. 9), and on November 28, 2022, the assigned Magistrate Judge issued a Report and Recommendation ["R&R"] conditionally granting the motion to dismiss the petition without prejudice unless Petitioner attempted to cure the petition either by (1) electing to proceed only on his exhausted claim, Claim 1, and withdrawing the unexhausted claims, (2) seeking a stay either under *Rhines v. Weber*, 544 U.S. 269 (2005) or *Kelly v. Small*, 315 F.3d 1063 (9th Cir. 2003), or (3) moving to

voluntarily dismiss the entire petition and return to state court to exhaust the unexhausted claims.  ECF No. 11.  On December 29, 2022, Petitioner filed a First Amended Petition, electing to proceed only on Claim 1 and abandoning Claims 2–4.  ECF No. 12.  On February 13, 2023, The Court issued an Order construing the First Amended Petition as a request to voluntarily dismiss the petition without prejudice, granting Petitioner's request, denying as moot Respondent's motion to dismiss, adopting in part and modifying in part the R&R with respect to the conditional grant of the motion to dismiss, and directing Petitioner to file a true amended petition on or before March 14, 2023.  ECF No. 13.  On March 9, 2023, Petitioner filed a document again requesting to abandon Claims 2–4 and proceed only on Claim 1 in a Second Amended Petition.  ECF No. 16.  On March 27, 2023, the Court issued an Order accepting ECF No. 16 as a Second Amended Petition "in the interests of judicial economy, . . .  liberally constru[ing] Petitioner's SAP as incorporating the allegations contained in the initial Petition (ECF No. 1) as to his first ground for relief, as well as all accompanying exhibits (ECF Nos. 1-1, 1-2, 1-3, 1-4, 1-5, 1-6)."  ECF No. 19 at 2.  On May 31, 2023, Respondent filed an Answer, a Memorandum of Points and Authorities in Support of the Answer (ECF Nos. 23, 23-1), and lodged the Reporter's and Clerk's Transcripts.  ECF No. 24.  On June 26, 2023, Petitioner filed a Traverse.  ECF No. 25.

## III.   STANDARD OF REVIEW

A state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits unless the state court adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (quoting 28 U.S.C. § 2254(d)(1)–(2)).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).   A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.*; *Bruce v. Terhune*, 376 F.3d 950, 953 (9th Cir. 2004).   "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).   "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338–39 (2006) (quoting 28 U.S.C. § 2254(e)(1)).

 "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   "If this standard is difficult to meet, that is because it was meant to be.   As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* at 102.

In a federal habeas action, "[t]he petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam)).   However, "[p]risoner pro se pleadings are given the benefit of liberal construction." *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

## IV.   DISCUSSION

In the sole claim in the SAP, Petitioner asserts the trial court improperly excluded GPS evidence, violating his federal constitutional right to present a defense.   ECF No. 16 at 1; *see also* ECF No. 1 at 6.   Respondent maintains habeas relief is unavailable because

the state court's rejection of Petitioner's claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable factual determination.  ECF No. 23 at 2; ECF No. 23-1 at 9–10.

Petitioner raised this claim in a petition for review in the California Supreme Court and the California Supreme Court's denial of that petition was without a statement of reasoning.  *See* ECF Nos. 8-7, 8-8.  The United States Supreme Court has repeatedly stated that a presumption exists "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S.Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").  As such, in the absence of record evidence or argument seeking to rebut this presumption, the Court will "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court with respect to Petitioner's sole federal habeas claim.  *See Ylst*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing.  We think that a presumption which gives them *no* effect—which simply 'looks through' them to the last reasoned decision—most nearly reflects the role they are ordinarily intended to play." (footnote omitted)).

Addressing Petitioner's claim "that the trial court erred when it excluded GPS information from his work truck that he contends would have demonstrated where his vehicle was located on any particular day" and "that this GPS evidence was probative as to J.T.'s credibility, because Smith had denied picking up J.T. from either school or the Boys and Girls Club during the time frame in which J.T. alleged he had committed some of the abuse," the appellate court reasoned and held as follows:

1. *Legal standards*

"Only relevant evidence is admissible at trial.  (Evid. Code, § 350.)  Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  A trial court has 'considerable

14

discretion' in determining the relevance of evidence." (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*).) "Although a trial court enjoys broad discretion in determining the relevance of evidence (citation), it lacks discretion to admit evidence that is irrelevant (citations) or excluded under constitutional or statutory law (citation). The proponent of proffered testimony has the burden of establishing its relevance . . . . (Citations.) Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence." (*People v. Morrison* (2004) 34 Cal.4th 698, 724.)

The trial court also has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines that the probative value of the evidence "is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

An appellate court reviews a trial court's rulings regarding relevance and admissibility under Evidence Code section 352 for an abuse of discretion. (*Merriman*, supra, 60 Cal.4th at p. 74.) A proper exercise of discretion is "'neither arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice.'" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.) [footnote: Although Smith acknowledges that evidentiary rulings are typically reviewed for an abuse of discretion, he nevertheless contends that his evidentiary challenges are entitled to de novo review because, he maintains, the alleged errors implicate his constitutional right to present a defense. Smith cites *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, footnote 7 (*Albarran*) and *People v. Seijas* (2005) 36 Cal.4th 291, 304 (*Seijas*) to support his contention that he is entitled to de novo review of the trial court's rulings with respect to the GPS and CWS referral evidence. As we will explain further, with respect to one of the alleged errors, we conclude that there was no error, and with respect to the other, we conclude that any erroneous

exclusion did not amount to a deprivation of Smith's constitutional right to present a full defense.  We therefore reject Smith's suggestion that the challenged evidentiary rulings should be reviewed de novo.  Smith's reliance on *Albarran* and *Seijas* does not alter our conclusion. Neither *Albarran* nor *Seijas* discussed the appropriate standard of review for a challenge contending that the trial court erroneously excluded evidence. *Albarran* addressed the appropriate standard for a trial court's denial of a motion for new trial, where "the authorities are less clear regarding the standard of review" than with respect to the granting of a new trial. (*Albarran*, at p. 224, fn. 7.)  Of note, the *Albarran* court expressly stated that, "(T)he decision on whether evidence, including gang evidence, is relevant, not unduly prejudicial and thus admissible, rests within the discretion of the trial court." (*Id.* at pp. 224–225.)  *Seijas* addressed the standard of review with respect to a trial court's ruling on a witness's assertion of a privilege, not an evidentiary ruling. (*Seijas*, supra, 36 Cal.4th at p. 304.)]

   2. *Evidence of the GPS monitoring records from Smith's work truck*

   a. *Additional background*

   Prior to trial, the prosecution moved to exclude evidence of the GPS records from the truck that Smith used when he worked for Cosco Fire Protection, on the ground that the records were "vague".  The court held an Evidence Code section 402 hearing regarding the GPS records.

   At the evidentiary hearing, T.R. testified that he was the operations manager at Cosco Fire Protection (Cosco) and that he started working there in March 2017.  According to T.R., Smith used a specific work truck while he worked for Cosco.  Cosco utilized a "G.P.S. monitoring system" that was installed on the company vehicles.   The company that provided the GPS monitoring system maintained a record of the GPS information, which was linked to a record of date, time, and location information for the starting and ending point of a trip.  The starting point for a trip would be the moment a vehicle was turned

on, and the ending point would be the moment the vehicle is turned off.  The GPS monitoring company did not record GPS information while a trip was in progress.  As a result, if Smith had been driving his company vehicle and made a stop without turning off the engine, the GPS monitoring company's system would not have a record of the date, time, or location of that stop.

T.R. explained that only he and other "senior management" employees could access the GPS monitoring company's records for Cosco's vehicles.  These Cosco employees downloaded the records from the GPS monitoring company's website.

Defense counsel argued that T.R. established the GPS monitoring records as proper business records, and that the records were admissible to show where Smith's truck began a trip and where it ended a trip between 2015 and the date of Smith's arrest in 2018.  When questioned by the court as to whether the records could demonstrate what Smith did before he arrived home, the defense argued that they "do determine that."

The prosecutor opposed admission of the GPS records, arguing that the records were not relevant, at least in part because the records covered time periods during which J.T. did not allege that abuse occurred, and because there were at least "400 entries" all demonstrating that Smith arrived home at different times.

The trial court ultimately decided to exclude the records, explaining, "They are too vague. We don't know the dates.  It's confusing.  What?  Are you going to offer the whole package there and say, 'Here's all the times he got home from work' when we don't know what he did or when he did it or how he did it. It's too vague.  It will not be allowed." [footnote: When asked by defense counsel whether the court would allow "a limited as to scope where the dates are — if (J.T.) testifies to (specific time frames)," the court indicated that it "would reconsider as to (a specific date), but generally speaking, no." Defense counsel made no further proffer as to a specific date or set of dates.]

/ / /
/ / /

17

b. *Analysis*

Smith asserts that the trial court erred in excluding the GPS monitoring records from his Cosco work truck. According to Smith, the GPS evidence was probative because the records "showed where and when appellant was located for each day during the period of time in question," and could therefore "show who was telling the truth" about whether Smith had, in fact, picked up J.T. after her school day ended, as she testified[.]

"'When the relevance of proffered evidence depends on the existence of a disputed material fact or facts, the proponent of that evidence bears the burden of establishing all preliminary facts pertinent to the question of relevance. (Citations.) The disputed evidence is inadmissible unless the court finds evidence sufficient to sustain a finding that those pertinent preliminary facts exist.'" (*People v. Melendez* (2016) 2 Cal.5th 1, 23, citing Evid. Code, § 403.) In this situation, Smith failed to establish the preliminary fact that the records actually showed that he did not pick up J.T. from school or that he was not home with her in the afternoons or early evenings, before J.T.'s mother returned home. [footnote: Smith failed to identify any specific record or records that showed that he could not have picked up J.T. from school or been home alone with J.T. during the relevant time period.] Given that the Cosco witness testified that the GPS monitoring system did not record information when the truck remained on, it was possible that Smith left work at different times each day and stopped to pick up J.T. from school or the Boys and Girls Club without there being any record of that event. Further, the trial court confirmed with the prosecutor that the records did not show that Smith arrived home after 5:00 p.m. every day, and defense counsel did not object or suggest otherwise. Instead, Smith provided a voluminous set of records, covering a multi-year period, that demonstrated that he arrived home at different times each day. Without establishing the preliminary fact that Smith did not pick up J.T. after school or that he was not home alone with her in the afternoon or early evening, the records were not relevant to a material issue in dispute. Nor could the records be used to "test the credibility of (J.T.)," because Smith failed to establish that the records actually contradicted J.T.'s testimony. Given that A.S., J.T.'s mother,

testified that A.S. would not return home until "(a)t least (6:00)" in the evening, unless the GPS records could show that Smith consistently arrived home later than 6:00 p.m.—which Smith did not claim the records could show—the records could not have disproved or even undermined J.T.'s testimony that Smith molested her at home, after she returned from school or an after school program and before her mother arrived home in the evening. As a result, the GPS evidence had no real probative value. The trial court therefore properly excluded the GPS monitoring records from Smith's work truck.

ECF No. 8-6 at 24-29.

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (same). "Only rarely ha[s the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (collecting cases). "While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 327. To merit habeas relief a petitioner must also in any event demonstrate the asserted federal error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

The Ninth Circuit has long employed a "five-part balancing test" to determine whether a state court's exclusion of evidence was reasonable, which incudes considering: "(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." *Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004) (citing *Miller v.*

*Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)).  But the Ninth Circuit has more recently held that a reviewing court may not rely on this circuit created balancing test to find that a state court's exclusion of evidence under a state discretionary rule violated clearly established federal law.  *See Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009); *see also Robertson v. Pichon*, 849 F.3d 1173, 1189 (9th Cir. 2017) ("We have previously held that a trial court's exercise of discretion to exclude evidence under a rule of evidence that requires balancing probative value against prejudice could not be an unreasonable application of clearly established Supreme Court precedent, because the Court has never addressed the question whether such a rule could violate a defendant's constitutional rights." (citing *Moses*, 555 F.3d at 758–59)).

Petitioner contends the trial court violated his federal constitutional right to present a complete and effective defense by unreasonably restricting the presentation of evidence, namely the GPS location records from his work truck.  ECF No. 1 at 6.  Specifically, Petitioner asserts that the outcome of his trial came down to a credibility determination and that the records in question would have shown when the truck was started, when Petitioner left work, and when the truck was turned off, which Petitioner contends would not only have supported his own testimony but would also have "cast serious doubt" on the testimony of victim J.T.  *Id.*

At the hearing as to the admission of the GPS evidence, the operations manager and custodian of records for Cosco Fire Protection testified the company had an account which contained records for their work trucks which "will indicate the date and the time and the starting address of when the vehicle was started up to -- to be operational," including both the city and zip code, and "when the vehicle reaches its end of that trip, it documents the date and the time and the ending address," again including city and zip code.  Reporter's Tr. 536–541 ["RT"], ECF No. 24-9 at 44–49.  The witness started working at Cosco in March 2017, did not know how much earlier Petitioner had been with Cosco, but knew Petitioner through work and believed Petitioner probably began work at 5:30 a.m. and worked until about 3:30 or 4 p.m., as the witness usually worked from 5 or 5:30 a.m. until

5 p.m.  RT 546–47.  Based on the records pulled, the first date with a GPS history for Petitioner's assigned vehicle was November 30, 2015.  RT 549–50.  The witness explained that "the historical data will tell us where the trip began and where the trip ended" but would not log the progress of a trip.  RT 564.  The witness acknowledged that if the vehicle made a stop, but the engine remained running, that stop would not be documented, explaining "[i]t would not show the end trip until the vehicle was shut off."  RT 566.

The trial court expressed concern with the volume of records the defense wished to introduce, stating that while "I don't question his credibility" and "I don't question the accuracy of his system," that "I question whether or not 500 days can be determined, what time he got home and when he got home and what he did before he got home."  RT 568. While the prosecutor pointed out that there were "no days of the week" in the records and "[t]here's a lot of record in here that are outside of the time frame of the charged conduct in this case," the trial court noted that for the two-year period in question "there's at least 400, if not more, working days."  RT 569.  As the state court recounted, the trial court denied the defense motion to admit the GPS records into evidence, reasoning they were "too vague" and "confusing."  *See* ECF No. 8-6 at 28; *see also* RT 570–71 ("Your motion to admit those is denied.  They are too vague.  It's confusing.  What?  Are you going to offer the whole package there and say, "'Here's all the times he got home from work'" when we don't know what he did or when he did it or how he did it.  It's too vague.  It will not be allowed.").  As the state court observed, the trial court indicated it would consider a subsequent request to introduce records as to a more specific time frame or date, *see* RT 571, but there is no indication the defense sought to do so.  *See* ECF No. 8-6 at 28 n.9.

Based on its analysis of the claim, the state appellate court concluded "the GPS evidence had no real probative value" and as such, "[t]he trial court therefore properly excluded the GPS monitoring records from Smith's work truck."  *Id.* at 29.  Given that the Ninth Circuit has held "a trial court's exercise of discretion to exclude evidence under a rule of evidence that requires balancing probative value against prejudice could not be an unreasonable application of clearly established Supreme Court precedent, because the

Court has never addressed the question whether such a rule could violate a defendant's constitutional rights," the Court is constrained to conclude the state court's rejection of this claim cannot be contrary to, or an unreasonable application of, clearly established federal law under 28 U.S.C. § 2254(d)(1).  *Robertson*, 849 F.3d at 1189 (citing *Moses*, 555 F.3d at 758–60); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [Petitioner's] favor, 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established law.'" (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006)).

Petitioner also fails to show the state court decision was based on an unreasonable factual determination under 28 U.S.C. § 2254(d)(2).  The Court is in accord with the trial and state appellate court that the records the defense sought to introduce were too voluminous, as they spanned multiple years and consisted of hundreds of entries showing Petitioner arrived home at different times each day.  Considering the defense made no effort to narrow the data down to a narrower and more relevant time frame, it is apparent the sheer number of records would likely have been confusing and onerous for the jury to sort through and attempt to evaluate.

Petitioner nonetheless asserts the GPS records could have supported his own testimony that he never picked up J.T. from school or from the after-school programs she participated in.  ECF No. 1 at 6; *see* RT 1777, 1782–83.  Petitioner also contends the records would also have impeached the credibility of J.T.'s testimony that Petitioner often picked her up.  ECF No. 1 at 6; *see* RT 830–33, 1023–24.  However, as the records custodian testified, the GPS data only showed locations for the start and end of a trip and would not document a stop in the event the engine remained running.  RT 564–66.  Consequently, the data could not differentiate between a trip where Petitioner drove straight home from work versus a trip where Petitioner picked up J.T. with the vehicle running and then drove home.  As such, the state court reasonably found: "Given that the Cosco witness testified that the GPS monitoring system did not record information when the truck remained on, it was possible that Smith left work at different times each day and

stopped to pick up J.T. from school or the Boys and Girls Club without there being any record of that event."  ECF No. 8-6 at 29.

Moreover, while Petitioner testified on direct examination that he never picked up J.T. from her after school Boys and Girls Club and he usually left work between 4:30 and 5 p.m., on cross-examination Petitioner acknowledged sending a text message about picking J.T. up after school from that very club between 3:30 and 4 p.m., although Petitioner claimed he had mistakenly indicated he would pick J.T. up between those times when he instead left work between those times.  RT 1761–63, 1857–58.  Regardless of whether or when Petitioner picked up J.T. from school or after school activities, Petitioner in any event admitted that he and J.T. were on multiple occasions alone together in the house for about an hour before A.S. got home from work.  RT 1834–35.  In fact, J.T., J.T.'s mother A.S., and Petitioner each testified about the after-school routines and all three witnesses acknowledged that Petitioner and J.T. were alone together in the house on numerous occasions before A.S. got home from work after 6 p.m.  *See e.g.*, RT 830–33, 1018, 1023–24, 1059-62, 1074–80, 1834–35.  Petitioner does not appear to dispute the correctness of the state court finding that "the trial court confirmed with the prosecutor that the records did not show that Smith arrived home after 5:00 p.m. every day, and defense counsel did not object or suggest otherwise," ECF No. 8-6 at 29, much less attempt to provide "'clear and convincing evidence'" to rebut the presumption of correctness.  *Rice*, 546 U.S. at 338–39 (quoting 28 U.S.C. § 2254(e)(1)).  Thus, the state appellate court was also not unreasonable in finding that "the records could not have disproved or even undermined J.T.'s testimony that Smith molested her at home, after she returned from school or an after[-]school program and before her mother arrived home in the evening." ECF No. 8-6 at 29.  The Court finds nothing in the record to support the conclusion that the state court decision was based on an unreasonable determination of the facts.

Petitioner's contentions in the Traverse fare no better, as Petitioner continues to insist the GPS evidence was both reliable and probative and points to several United States Supreme Court cases to support his contention that GPS data, such as that from cellular

telephone signals or GPS tracking devices, can create a "detailed log" and a "precise" and "comprehensive" record of an individual's movements.  *See* ECF No. 25 at 2–5 (citing *United States v. Jones*, 565 U.S. 400 (2012); *Riley v. California*, 573 U.S. 373 (2014); *Carpenter v. United States*, 138 S.Ct. 2206 (2018)).

First, as to the purported reliability of the GPS evidence, the Court agrees with the findings of the trial court, *see* RT 570, and does not question the reliability or accuracy of that type of evidence.  As to the probative value of this type of evidence, each of the Supreme Court cases Petitioner relies upon arose in the context of whether the government's actions constituted searches within the meaning of the Fourth Amendment and required a warrant, which stands in stark contrast from the context presented here, in which a state trial court made a discretionary evidentiary decision to exclude GPS data sought by the defense.  Regardless, the Court remains unpersuaded by Petitioner's assertions about the probative value of the GPS evidence in his case, particularly Petitioner's assertion that the cited Supreme Court authority establishes this type of location data creates a "comprehensive" record of an individual's movements, given none of the three cases concerns the type of GPS data at issue in the instant case.  *See Jones*, 565 U.S. at 403 (government attached GPS tracking device to a vehicle which "[b]y means of signals from multiple satellites, established the vehicle's location within 50 to 100 feet" and relayed location information to government computers); *see also Riley*, 573 U.S. at 378–79 (government accessed contents of cell phone, including videos, photos and presumably texts and contacts list); *see also Carpenter*, 138 S.Ct. at 2211–13 (government obtained "historical cell phone records that provide a comprehensive chronicle of the user's past movements," namely a total of 12,898 location points over the time period sought, "an average of 101 data points a day").  As discussed previously, the GPS evidence the defense sought to introduce in this case only reflected start and end point locations for trips and did not record or collect data pertaining to when the vehicle stopped but the engine remained running.  As such, there is no evidence the GPS data in this case was able to create any sort of "log" or other record of Petitioner's actual movements, as the evidence clearly reflected

in this case "the historical data will tell us where the trip began and where the trip ended" but would not log the trip during its progress.  RT 564.  Accordingly, the Court finds neither *Jones*, *Carpenter*, nor *Riley* at all analogous to the instant case with respect to the type of location data at issue, much less the potential probative value of that data.

Finally, even assuming Petitioner were somehow able to satisfy the provisions of 28 U.S.C. § 2254(d)(1) or (d)(2), it is clear Petitioner cannot demonstrate that any potential error in disallowing the GPS evidence "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see Fry v. Pliler*, 551 U.S. 112, 119 (2007) (noting § 2254(d) "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it"); *see also Frantz v. Hazey*, 533 F.3d 724, 735–36 (9th Cir. 2008) (en banc).  On this record, the Court finds any error clearly harmless under *Brecht*.  As discussed above, Petitioner fails to show the GPS data would have supported his own testimony or impeached J.T.'s credibility or her testimony that Petitioner molested her when they were alone together in the house before her mother came home from work. Again, the data only showed start and end points for the work truck's movements, and Petitioner acknowledged he and J.T. were occasionally alone together at home after school and before A.S. came home from work, independent of whether Petitioner had or had not picked J.T. up from school or from her after-school activities.

Additionally, J.T. and her stepsister S.S. not only both testified about the abuse, but also at various points told several other individuals about Petitioner's inappropriate behavior, as J.T. told her friend R.Y., R.Y.'s mother L.Y, J.T.'s own mother A.S., a child welfare services worker, and a detective, and S.S. told her mother N.B., a child welfare service worker, and a forensic interviewer, each of whom also testified at trial.  RT 819– 69, 905–1039 (testimony of J.T.); RT 1275–1337 (testimony of S.S.); RT 1040–1125 (testimony of A.S.); RT 1362–1408 (testimony of N.B.); RT 1224–45 (testimony of R.Y.); RT 1245–1264 (testimony of L.Y.); RT 1410–51 (testimony of child welfare service worker who spoke to both J.T. and S.S.); RT 1515–63 (testimony of forensic interviewer); RT 1567–73 (testimony of detective); *see also* ECF No. 8-6 at 35 ("[B]oth minor victims

provided specific, detailed and credible testimony about the abuse.  Not only was it demonstrated that the two victims' stories about what had occurred were consistent over time, but their stories were consistent with each other, and other witnesses corroborated these minor victims' testimony.").

Accordingly, the Court is not persuaded the state court rejection of this claim was either contrary to or an unreasonable application of clearly established federal law, nor that it was it based on an unreasonable determination of the facts. *Richter*, 562 U.S. at 97–98. Nor does Petitioner show that any alleged error in the exclusion of this evidence had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.  As such, Petitioner's sole habeas claim does not merit habeas relief.

## IV.    CERTIFICATE OF APPEALABILITY

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C.A. foll. § 2254.  "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" *Shoemaker v. Taylor*, 730 F.3d 778, 790 (9th Cir. 2013) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  The Court finds that issuing a certificate of appealability is not appropriate in this instance because reasonable jurists would not find debatable or incorrect the Court's conclusion that Petitioner's sole claim does not warrant federal habeas relief, nor does the Court find that any of the issues presented deserve encouragement to proceed further. *See* 28 U.S.C. § 2253(c); *Slack*, 529 U.S. at 484.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

**V.      CONCLUSION AND ORDER**

2

　　　For the reasons discussed above, the Court **DENIES** the Petition for a Writ of

3

Habeas Corpus and **DENIES** a Certificate of Appealability.

4

　　　**IT IS SO ORDERED.**

5

Dated:  August 21, 2023

6

Hon. Janis L. Sammartino
United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22-CV-856 JLS (DDL)